# No. 24-1310

# In The United States Court of Appeals
## For the Eighth Circuit

JAN KUKLENSKI
*Plaintiff – Appellant,*

*v.*

MEDTRONIC USA, INC.,
*Defendant – Appellee.*

**On Appeal from the U.S. District Court for the District of Minnesota, Case No. 0:22-cv-00438-ECT-JFD, Eric C. Tostrud, U.S. District Judge**

---

## APPELLANT'S OPENING BRIEF ON APPEAL

---

Pamela A. Johnson
Pamela M. Spera
Kyle P. Hahn
Halunen Law
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Email: p.johnson@halunenlaw.com
         spera@halunenlaw.com
         hahn@halunenlaw.com
*Attorneys for Appellant*

Argument Requested

# SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Defendant-Appellee Medtronic USA, Inc., a Minnesota corporation, violated the Minnesota Human Rights Act ("MHRA") by terminating Plaintiff-Appellant Jan Kuklenski when she requested an accommodation for her disability. The district court erred in granting summary judgment to Medtronic based on its conclusion that Kuklenski, who resides in Michigan and performed much of her work remotely, was not an "employee" under the MHRA because she did not "work in the state." Minn. Stat. § 363A.03, Subd. 15.

Kuklenski requests a 20-minute oral argument to facilitate the resolution of a significant question of state law: how should courts define the phrase "works in this state" in the context of Minnesota employees who work remotely? Because Minnesota courts have not resolved this issue of first impression and because the district court's summary judgment order created an intra-district conflict, this Court should certify to the Minesota Supreme Court the question of how to define the phrase "works in this state" as it appears in the MHRA. Oral argument will further elucidate errors underlying the district court's conclusion that an "employee" under the MHRA must show "a direct connection between [the individual's] Minnesota presence and their employer's statutory violation," App. 185; R. Doc. 73, at 16, a requirement found nowhere in the MHRA and contrary to its remedial purpose.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to F.R.A.P. 26.1 and Rule 26.1A of the Local Rules of the United States Court of Appeals for the Eighth Circuit, the Appellant discloses the following corporate interests:

1. The parent companies of the corporation: Not Applicable. Appellant is an individual person.

2. Subsidiaries not wholly owned by the corporation: Not Applicable. Appellant is an individual person.

3. Any publicly held company that owns ten percent (10%) or more of the corporation: Not Applicable. Appellant is an individual person.

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT ............1

CORPORATE DISCLOSURE STATEMENT ........................................................2

TABLE OF AUTHORITIES..................................................................................5

STATEMENT OF THE ISSUES ...........................................................................10

INTRODUCTION .................................................................................................11

STATEMENT OF THE CASE................................................................................15

   I. Factual Background. ......................................................................................15

     A.   Kuklenski had substantial contacts with Minnesota and traveled to
Minnesota for trainings, conferences, and meetings. ...............................15

     B.   Medtronic closed its Minnesota offices during the COVID-10 pandemic,
forcing all its employees to work remotely. .............................................16

     C.   Kuklenski took protected leave under the Family and Medical Leave Act
to have surgery for her inner-ear condition. ............................................17

     D.   Medtronic denies Kuklenski's request for a reasonable accommodation
and terminates her because of her inner-ear condition.............................17

   II. Procedural Background. ..................................................................................19

SUMMARY OF ARGUMENT..............................................................................23

ARGUMENT .......................................................................................................26

   I. Standard of Review.........................................................................................27

   II. Legal Principles. ...........................................................................................27

     A.   The plain text and legislative purpose of the MHRA dictate the meaning
of the phrase "works in this state.".........................................................28

     B.   The legislature intended for courts to interpret the MHRA liberally and in
light of evolving societal standards. ........................................................29

     C.   Federal courts determine whether an individual is an employee under the
MHRA using a totality-of-the-circumstances test. ..................................31

   III. The District Court Erred in Concluding That Kuklenski Was Not an Employee
Under the MHRA. ........................................................................................32

A.    The plain text of the MHRA supports a contacts-based, totality-of-the-circumstances test for determining whether an individual "works in" Minnesota. ....................................................................................33

   *(1)*    *The simple present tense requires only customary or habitual action.* ..................................................................................33

   *(2)*    *Temporary interruptions don't negate the simple-present tense meaning of "works".* ...........................................................35

   *(3)*    *The word "in" embraces both physical as well as virtual or abstract connections.* ..........................................................37

   *(4)*    *The text contains no suggestion that a person must be in Minnesota at the moment their employer discriminates against them.....................39*

B.    A contacts-based approach fulfills the MHRA's remedial purpose. ........44

C.    Kuklenski "worked in" Minnesota in light of her significant, regular Minnesota contacts and travel to Minnesota for work. ...........................46

D.    Kuklenski's Absence from Minnesota Due to Medical Leave and the COVID-19 Pandemic Does Not Alter This Analysis ................................49

IV. This Court Should Certify the Question of the Definition of "Works in This State" Under the MHRA to the Minnesota Supreme Court. ...........................55

A.    Legal principles. ....................................................................................55

B.    This Court should exercise its discretion to certify the question of "works in this state" to the Minnesota Supreme Court........................................56

CONCLUSION ....................................................................................................62

CERTIFICATE OF COMPLIANCE .....................................................................63

VIRUS CHECK CERTIFICATION ......................................................................64

CERTIFICATE OF SERVICE .............................................................................65

# TABLE OF AUTHORITIES

**Cases**

*500, LLC v. City of Minneapolis*,
   837 N.W.2d 287 (Minn. 2013)............................................................27
*Amaral v. St. Cloud Hosp.*,
   598 N.W.2d 379 (Minn. 1999)............................................................27
*Frieler v. Carlson Mktg. Grp., Inc.*,
   751 N.W.2d 558 (Minn. 2008) ..........................................................12
*Green Giant Co. v. Comm. of Revenue*,
   534 N.W.2d 710 (Minn. 1995)............................................................40
*Hans Hagen Homes, Inc. v. City of Minnetrista*,
   728 N.W.2d 536 (Minn. 2007)............................................................26
*Hansen v. Robert Half Int'l, Inc.*,
   813 N.W.2d 906 (Minn. 2012) ................................................... 27, 28
*Kenneh v. Homeward Bound, Inc.*,
   944 N.W.2d 222 (Minn.2020)..………………………..……...9, 12, 28, 42, 43, 51
*KSTP-TV v. Ramsey Cnty.*,
   806 N.W.2d 785 (Minn. 2011)............................................................40
*State v. Cummings*,
   2 N.W.3d 528 (Minn. 2024)................................................................27
*State v. Gaiovnik*,
   794 N.W.2d 643 (Minn. 2011)............................................................26
*State v. Mikell*,
   960 N.W.2d 230 (Minn. 2021)............................................................26
*Tapia v. Leslie*,
   950 N.W.2d 59 (Minn. 2020)..............................................................26

**Federal Statutes**

Minn. Stat. § 363A.02 ............................................................... 28, 42
Minn. Stat. § 363A.03 ...............................................9, 11, 25, 38
Minn. Stat. § 363A.04 ...............................................9, 11, 25, 27
Minn. Stat. § 363A.08 ............................................................... 17, 38
Minn. Stat. § 480.065 .................................................................9, 53
Minn. Stat. § 645.08 ........................................................................27
Minn. Stat. § 645.16 ................................................... 26, 27, 42

Minn. Stat. § 645.17.........................................................................27, 40

**Other Authorities**

*Sullivan v. Oracle Corp.*,
   557 F.3d 979 (9th Cir. 2009)...............................................................57
Symeon C. Symeonides, *Choice of Law in the American Courts in 2020: Thirty-*
   *Fourth Annual Survey*, 69 American Journal of Comparative Law 13 (2021) ....37

**State Statutes**

*Hull v. ConvergeOne, Inc.*,
   570 F. Supp. 3d 681 (D. Minn. 2021)...................................................46
*Kozloski v. Am. Tissue Servs. Found*,
   2007 WL 2885365 (D. Minn. Sept. 27, 2007)......................................29
*Krutchen v. Zayo Bandwidth Ne., LLC*,
   591 F. Supp. 2d 1002 (D. Minn. 2008)..................................................29
*Kuklenski v. Medtronic USA, Inc.*,
   635 F. Supp. 3d 726 (D. Minn. 2022)...................................................26
*Lapushner v. Admedus Ltd*.,
   2020 WL 5106818 (D. Minn. Aug. 31, 2020)...................... 8, 30, 31, 45, 46
*Miller v. Grand Holdings, Inc.*,
   2005 WL 1745639 (D. Minn. Jul. 26, 2005) .........................................41
*Premier Bank v. Becker Dev., LLC*,
   785 N.W.2d 753 (Minn. 2010) ..............................................................39
*Rock v. Rathsburg Assocs., Inc.*,
   2022 WL 4450418 (D. Minn. Sept. 23, 2022)...............................29, 44
*Walton v. Medtronic USA, Inc.*,
   2022 WL 3108026 (D. Minn. Aug. 4, 2022)......................8, 26, 48, 55
*Wilson v. CFMOTO Powersports, Inc*.,
   2016 WL 912182 (D. Minn. Mar. 7, 2016) ..................................9, 11, 30, 31, 45
*Zarling v. Abbott Lab'ys*,
   2021 WL 2551438 (D. Minn. June 22, 2021)................................. 30, 44

**Minnesota Cases**

*Burchett v. Target Corp.*,
   340 F.3d 510 (8th Cir. 2003)................................................................17
*Carpenters' Pension Fund of Ill. v. Neidorff*,
   30 F.4th 777  (8th Cir. 2022)................................................................15

*Eckerberg v. Inter-State Studio & Publishing Co.*,
 860 F.3d 1079 (8th Cir. 2017)..............................................................35

*Godfrey v. State Farm Fire & Cas. Co.*,
 11 F.4th 601 (8th Cir. 2021)..........................................................9, 54

*Hatfield, by Hatfield v. Bishop Clarkson Mem'l Hosp.*,
 701 F.2d 1266 (8th Cir. 1983) .............................................................13

*In re SuperValu, Inc.*,
 925 F.3d 955 (8th Cir. 2019) ..............................................................12

*Johnson v. John Deere Co.*,
 935 F.2d 151 (8th Cir. 1991) ........................................................ 13, 54

*Murray v. Stuckey's, Inc.*,
 50 F.3d 564 (8th Cir. 1995)..................................................................33

*Olson v. Push, Inc.*,
 640 Fed. App'x 567 (8th Cir. 2016)......................................................39

*Perkins v. Clark Equip. Co.*,
 823 F.2d 207 (8th Cir. 1987)................................................................54

*Pitman Farms v. Kuehl Poultry, LLC*,
 48 F.4th 866 (8th Cir. 2022)................................................................28

*Riegelsberger v. Air Evac EMS, Inc.*,
 970 F.3d 1061 (8th Cir. 2020)..............................................................25

*Smith v. SEECO, Inc.*,
 922 F.3d 406 (8th Cir. 2019)................................................................56

**Eighth Circuit Cases**

*Syeed v. Bloomberg L.P.*,
 58 F.4th 64 (2d Cir. 2023)......................................................................9

*Syeed v. Bloomberg L.P.*,
 No. 20, --- N.E.3d ----, 2024 WL 1097279 (N.Y. Mar. 14, 2024) ......................57

**Federal Cases**

28 U.S.C. § 1291 ....................................................................................7
28 U.S.C. § 1331 ....................................................................................7
28 U.S.C. § 1332 ..................................................................................34
28 U.S.C. § 1367 ....................................................................................7
42 U.S.C. § 2000e-5 ...............................................................................7

**United States Supreme Court**

*Arizonans for Off. Eng. v. Arizona*,
 520 U.S. 43 (1997)................................................54
*Brockett v. Spokane Arcades, Inc.*,
 472 U.S. 491 (1985)..............................................55
*Int'l Shoe Co. v. Washington*,
 326 U.S. 310 (1945)..............................................43
*McKesson v. Doe*,
 592 U.S. 1 (2020)................................................54

## JURISDICTIONAL STATEMENT

The district court had original jurisdiction over this case under 28 U.S.C. §§ 1331-32 and 42 U.S.C. § 2000e-5(f)(3) and supplemental jurisdiction under 28 U.S.C. § 1367(a).

The appeal is from a final judgment entered on November 14, 2023 and an amended judgment entered on November 22, 2023, which disposed of all parties' claims. App. 189, R. Doc. 74. Appellant timely filed her appeal on February 14, 2024. App. 195, R. Doc. 81. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

I.    Did the district court err in concluding that Plaintiff Jan Kuklenski was not an employee under the MHRA despite her significant, regular Minnesota contacts and periodic travel to Minnesota for work?

Apposite Cases:
- *Lapushner v. Admedus Ltd.*, No. 20-cv-572, 2020 WL 5106818 (D. Minn. Aug. 31, 2020)
- *Walton v. Medtronic USA, Inc.*, No. 22-cv-0050, 2022 WL 3108026 (D. Minn. Aug. 4, 2022)
- *Wilson v. CFMOTO Powersports, Inc.*, No. 15-cv-3192, 2016 WL 912182 (D. Minn. Mar. 7, 2016)
- *Kenneh v. Homeward Bound, Inc.*, 944 N.W.2d 222 (Minn. 2020).

Apposite Statutory Provisions:
- Minn. Stat. § 363A.03
- Minn. Stat. § 363A.04

II.    Given the absence of relevant state court decisions and a recently-created intra-district conflict, should this Court certify to the Minnesota Supreme Court the question of the definition of the phrase "works in this state" under the MHRA?

Apposite Cases:

- *Godfrey v. State Farm Fire & Cas. Co.*, 11 F.4th 601 (8th Cir. 2021)
- *Syeed v. Bloomberg L.P.*, 58 F.4th 64 (2d Cir. 2023).

Apposite Statutory Provisions:

- Minn. Stat. § 480.065

# INTRODUCTION

Jan Kuklenski worked for Medtronic, a Minnesota employer, for 22 years. She performed exceptionally well in various leadership positions—most recently as a Senior Director. Kuklenski lives in Michigan, but her work involved extensive contacts with Minnesota, including frequent work travel to the state. In 2020 and 2021, two serious disruptions struck in close succession. First came the COVID-19 pandemic. Medtronic, like many employers, mandated remote work for white-collar employees, including Kuklenski. Second, Kuklenski suffered a serious ear and brain infection. This diagnosis forced Kuklenski to take a medical leave of absence from work. These twin disruptions temporarily prevented Kuklenski from physically traveling to Minnesota. Kuklenski's illness temporarily kept her from working entirely.

After she exhausted her Family and Medical Leave Act ("FMLA") leave, Kuklenski asked for a modest amount of additional unpaid time off to finish her medical recovery before restarting work. But Medtronic denied the request without engaging in the interactive process or any undue-hardship analysis. Medtronic then terminated Kuklenski, citing her inability to return to work. Kuklenski sued, claiming that Medtronic violated the disability-discrimination provisions of the Minnesota Human Rights Act (MHRA).

The district court granted summary judgment in favor of Medtronic, holding that "Kuklenski was [not] an employee protected by the Minnesota Human Rights Act," because, in the district court's view, Kuklenski did not "work in" Minnesota. That holding was misplaced.

The MHRA defines "employee" as "an individual who is employed by an employer and who resides or works in this state." Minn. Stat. § 363A.03, Subd. 15. The MHRA contains an explicit textual directive: the Act "shall be construed liberally." *Id.* § 363A.04. Neither this Court, the Minnesota Supreme Court, nor Minnesota Court of Appeals has interpreted the MHRA's definition of "employee." Yet, under the significant body of case law developed in Minnesota federal district court, employees like Kuklenski are covered by the MHRA if the totality of the circumstances shows that they have significant, customary Minnesota contacts in their employment working remotely for a Minnesota employer. *See e.g., Wilson v. CFMOTO Powersports, Inc*., No. 15-cv-3192, 2016 WL 912182, at *6 (D. Minn. Mar. 7, 2016). This contacts-based approach aligns with the text of the statute and the legislature's intent.

The district court below adopted a far narrower construction of the statute. In the district court's telling, a person is an employee covered by the MHRA only when there is "a direct connection between [an individual's] Minnesota presence and their employer's statutory violation." App. 185; R. Doc. 73, at 16.

That narrow interpretation—requiring a direct nexus between an employee's physical location and the statutory violation—misses the mark. The text of the MHRA forecloses any interpretation requiring physical presence in Minnesota at the time of the discrimination—particularly where, as here, the limitations on travel were both unexpected and transient, and precluded by Kuklenski's medical condition, the pandemic, and Medtronic's remote work order for its entire U.S. market.

When a state's highest court has not addressed an issue of state law, federal courts must predict how the high court would resolve that issue. *In re SuperValu, Inc.*, 925 F.3d 955, 963 (8th Cir. 2019). Minnesota Supreme Court jurisprudence demonstrates that the court, if faced with the issue, would interpret the MHRA to protect remote employees of Minnesota employers who maintain significant contacts with Minnesota. *See Kenneh v. Homeward Bound, Inc*., 944 N.W.2d 222, 231 (Minn. 2020) (describing the MHRA as a broadly remedial statute that must "evolve" to take account of "societal change"); *Frieler v. Carlson Mktg. Grp., Inc*., 751 N.W.2d 558 (Minn. 2008) (adopting a broader definition of "supervisor" based on the legislature's liberal-construction mandate and "the reality of the modern-day workplace").

With the statute properly framed, Kuklenski worked in Minnesota. She traveled to the state very frequently—before COVID, she physically worked in

Minnesota about 20 percent of the time. She regularly interacted with her supervisors in Minnesota. And many of her customers were in Minnesota as well. Neither the COVID-19 pandemic nor her medical leave altered Kuklenski's status as a Minnesota employee. These were transient disruptions. They did not alter the fact that Kuklenski customarily and habitually works in Minnesota; she would have resumed doing so as soon as these disruptions ended.

Although this Court is certainly capable of resolving uncertain and novel legal questions, the best course here is to certify this case to the Minnesota Supreme Court. The question presented in this case is at once important, novel, unsettled, and recurring. *Hatfield, by Hatfield v. Bishop Clarkson Mem'l Hosp.*, 701 F.2d 1266, 1268 (8th Cir. 1983); *Johnson v. John Deere Co.*, 935 F.2d 151, 153–54 (8th Cir. 1991). Rapidly shifting work-from-home trends underscore the importance of resolving these sorts of quasi-jurisdictional cross-border questions. And because cases like these almost exclusively end up in federal court (with diverse parties and federal claims in the mix), certification may be the only practical route to resolve these important and uncertain questions once and for all.

For these reasons, this Court should certify this case to the Minnesota Supreme Court. If this Court declines to do so (or if the Minnesota Supreme Court declines to accept review), this Court should reverse the district court's judgment and remand for trial.

**STATEMENT OF THE CASE**

## I.     Factual Background.

Kuklenski joined Medtronic as a Cardiovascular Account Manager in 1999. App. 3; R. Doc. 1, at 3. Medtronic promoted Kuklenski numerous times over the next two decades; she remained an exceptional performer and loyal employee throughout her significant tenure. *Id.* Kuklenski ultimately held the position of Senior Director, Value Based Healthcare ("VBHC") Partnership Lead, Americas, until her unlawful termination in December 2021. *Id.*

### A. Kuklenski had substantial contacts with Minnesota and traveled to Minnesota for trainings, conferences, and meetings.

Medtronic is headquartered in Minnesota. Kuklenski lives in Michigan. But over the course of her 22 years of employment with Medtronic, Kuklenski had substantial contacts with Minnesota. App. 1, 3; R. Doc. 1, at 1, 3.

To start, Kuklenski was physically present in Minnesota performing work at Medtronic's offices approximately 20 percent of the time. App. 168; R. Doc. 69, at 1; App. 219; R. Doc. 45-1, at 13. This work included work-related trainings, work-related conferences, and meetings with Medtronic's customers and employees in Minnesota. *Id.* Some years, Kuklenski spent "a lot more" than 20 percent of her time physically working in Minnesota. App. 219; R. Doc. 45-1, at 13.

During her visits to Minnesota, Kuklenski interacted with Minnesota-based Medtronic customers, including Allina Health. App. 168; R. Doc. 69, at 1. She

reported to and collaborated with her Medtronic supervisors, all of whom were located in Minnesota. App. 169; R. Doc. 69, at 2. And on a daily basis, Kuklenski communicated via emails, telephone calls, and video calls with her colleagues— most of whom were located in Minnesota. App. 168–69; R. Doc. 69, at 1–2.

Kuklenski performed her work in Minnesota regularly and at Medtronic's direction.

### B. Medtronic closed its Minnesota offices during the COVID-10 pandemic, forcing all its employees to work remotely.

Like many employers across the country, Medtronic closed its Minnesota offices during the COVID-19 pandemic in 2020 and 2021. App. 219–20, 225; R. Doc. 45-1, at 13–14, 21. During this time, Kuklenski and every other employee— even those who resided in Minnesota—worked remotely. *Id.* Kuklenski last visited Minnesota for work in early 2020—shortly before COVID-19 made such work travel impossible. App. 185; R. Doc. 71, at 16; Add. 16.

Medtronic's entire United States workforce remained remote throughout most of 2021. Medtronic's CEO confirmed on August 24, 2021 that Medtronic planned to "bring [its] employees back to the office" at the end of September 2021.[1] As of

---

[1] *See* Bloomberg Markets: The Close, "Medtronic CEO on Earnings, Return to Office, Competition," *available at* https://www.bloomberg.com/news/videos/2021-08-24/medtronic-ceo-on-earnings-return-to-office-competition-video (last accessed April 2, 2024). "An appellate court may take judicial notice of a fact for the first time on appeal, and may consider matters of public record." *Carpenters' Pension Fund of Ill. v. Neidorff*, 30 F.4th 777, 795 n.16 (8th Cir. 2022).

Kuklenski's termination in December 2021, "Medtronic was still mostly working remotely." App. 216; R. Doc. 45-1, at 10.

### C. Kuklenski took protected leave under the Family and Medical Leave Act to have surgery for her inner-ear condition.

In mid-2021, while Medtronic employees were still working remotely during the pandemic, Kuklenski took medical leave under the FMLA to have surgery relating to a severe inner-ear condition. App. 124; R. Doc. 51-17, at 3. Kuklenski took twelve weeks off for surgery and recovery between June 7, 2021 and August 28, 2021. *Id.* Kuklenski sought and received one week of additional leave through September 6, 2021. App. 116; R. Doc. 51-15, at 8.

### D. Medtronic denies Kuklenski's request for a reasonable accommodation and terminates her because of her inner-ear condition.

Because Kuklenski's surgery was more extensive and invasive than her doctors had anticipated, Kuklenski sought a reasonable accommodation for her ongoing medical condition: a three-month extension of leave until December 6, 2021, when Kuklenski was prepared to return to work with no restrictions. App. 124; R. Doc. 51-17, at 3. On September 9, 2021, Medtronic decided to deny Kuklenski's request for leave. App. 121; R. Doc. 51-16, at 2; App. 123; R. Doc. 51-17, at 2. Shortly thereafter, Medtronic terminated Kuklenski. App. 96; R. Doc. 51-10.

Medtronic's denial of Kuklenski's accommodation request and its hasty termination decision both violated the MHRA. That statute required Medtronic

"engage in an interactive process to identify potential accommodations that could overcome [Kuklenski's] limitations" stemming from her temporary medical condition. *Burchett v. Target Corp.*, 340 F.3d 510, 517 (8th Cir. 2003); *see* Minn. Stat. § 363A.08, Subd. 6(a).

Instead, Medtronic scheduled a September 15, 2021 meeting between Kuklenski and her supervisors only "to communicate [its] decision not to accommodate the leave." App. 121; R. Doc. 51-16, at 2. Medtronic planned to communicate to Kuklenski—at the same meeting—that "the organization has made the decision…that [Kuklenski's] role needs to be filled to ensure business continuity." *Id.* While Medtronic's internal communications labeled this meeting an "interactive process meeting," App. 98; R. Doc. 51-12, at 2; App. 110, R. Doc. 51-15, at 2, the same communications revealed that Medtronic did not plan to engage in any interactive process with Kuklenski or to "identify potential accommodations" addressing her inner-ear condition. App. 121; R. Doc. 51-16, at 2. Instead, Medtronic told Kuklenski she couldn't take any more leave and that her position would be filled by someone else. App. 126; R. Doc. 51-18, at 2.

Nor did Medtronic meet its burden under the MHRA to show that granting Kuklenski's leave request would "impose an undue hardship" on it. Minn. Stat. § 363A.08, Subd. 6(a). Instead, Medtronic told Kuklenski merely that her "continual absence will disrupt…business continuity and growth towards targets." App. 123;

R. Doc. 51-17, at 2. Medtronic terminated Kuklenski on December 9 without severance and after 22 years of service. App. 96; R. Doc. 51-10. Despite Medtronic's contrived claims of hardship, Kuklenski's replacement did not even perform Kuklenski's key job responsibility: managing four VBHC Partnerships. App. 64; R. Doc. 51-2, at 2-10. Medtronic's fourth-quarter fiscal year 2022 financial results saw a 5 percent increase in the company's $31.686 billion revenue. App. 87–88; R. Doc 51-7. Between 2021 and 2022, Medtronic's total employee count increased from 90,000 to 95,000 people. App. 90; R. Doc. 51-8.

## II.  Procedural Background.

Kuklenski filed suit against Medtronic on February 16, 2022, alleging age and disability discrimination under the MHRA; violations of the FMLA; promissory estoppel; and retaliation under the Minnesota Whistleblower Act, Minn. Stat. § 181.932, Subd. 1. App. 1–15; R. Doc. 1, at 1–15. On October 12, 2022, the district court granted Medtronic's motion to dismiss Kuklenski's FMLA and promissory estoppel claims and otherwise denied the motion. App. 17–40; R. Doc. 17, at 1–24.

In its motion-to-dismiss order, the district court rejected Medtronic's argument that Kuklenski was not an employee under the MHRA. App. 23; R. Doc. 17, at 7. Outlining the Minnesota-contacts standard other judges in the district applied to determine who qualified for MHRA protection, App. 24–26; R. Doc. 17, at 8–10, the district court noted that Kuklenski "worked frequently in Minnesota and

had frequent contacts with Minnesota-based supervisors and personnel," App. 19; R. Doc. 19, at 3. The court described how Kuklenski "routinely visited Minnesota for work over the course of her career with Medtronic," *id.* (cleaned up), and how she "had regular remote contact with Minnesota-based Medtronic personnel," *id.* In light of these substantial contacts, the district court held that "Kuklenski has alleged facts sufficient to plausibly meet the Minnesota-contacts standard applied in the intra-District cases cited above." App. 27; R. Doc. 17, at 11.

After discovery, Medtronic moved for summary judgment and Kuklenski cross-moved for partial summary judgment. App. 202–03; R. Docs. 42, 49. On November 20, 2023, the district court granted Medtronic's motion on the ground that Kuklenski was not an employee under the MHRA because she did not "work in" Minnesota. App. 170; R. Doc. 71, at 1; App. 182; R. Doc. 73, at 13. In light of this conclusion, the district court did not "consider the merits of Kuklenski's motion," instead denying it as moot. App. 170; R. Doc. 71, at 1.

In its summary-judgment order, the district court disavowed the Minnesota-contacts standard it embraced in its motion-to-dismiss order. App. 182–83; R. Doc. 73, at 13–14. Instead, the district court held that the statutory phrase "works in this state" "requires at least a modicum of physical presence for an individual to be protected as an employee under the MHRA." App. 181; R. Doc. 73, at 12. Despite its prior conclusion that the Minnesota contacts Kuklenski pleaded in her complaint

were sufficient to show that she "worked in" Minnesota, the district court now held that, "[w]ithout any physical presence in Minnesota, Kuklenski did not work in Minnesota in late 2020 or 2021." App. 182; R. Doc. 73, at 13. The district court dismissed other cases that "seemed to rely on a Minnesota-contacts based approach to the MHRA definition of employee" as merely "persuasive, not binding." *Id.*

The district court relied heavily on the fact that "Kuklenski was not physically present in Minnesota at all from February 2020 through her termination on December 8, 2021." App. 183; R. Doc. 73, at 14. "It makes no difference that Kuklenski might have been in Minnesota but for the COVID-19 pandemic," the district court wrote. App. 185; R. Doc. 73, at 16. The court did not mention that, starting in June 2021, Kuklenski was unable to work *or* travel due to her surgery recuperation and ongoing medical condition.

The district court did not reach the merits of Kuklenski's disability-discrimination claim or address her arguments that Medtronic failed to engage in an interactive process or substantiate its undue hardship defense, App. 188; R. Doc. 73, at 29—both requirements of the MHRA. *See* Minn. Stat. § 363A.08, Subd. 6. The court explained that the disability claim "is a closer call" and distinguished in the Eighth Circuit case on which the court stated Medtronic "relies heavily." App. 188; R. Doc. 73, at n. 10.

On January 16, 2024, the district court denied Kuklenski's motion to amend the judgment and certify the question of the meaning of the phrase "works in this state" to the Minnesota Supreme Court. App. 193, 205; R. Doc. 8, at 4, R. Doc. 80.

This appeal followed.

## SUMMARY OF ARGUMENT

This appeal is about whether the Minnesota Human Rights Act, a remedial statute designed to protect a wide swath of employees in the state of Minnesota, should extend its liberal coverage to individuals employed by Minnesota companies who perform some of their work remotely and some locally. The answer to that question is "yes." The district court erred in rejecting the totality-of-the-circumstances, Minnesota-contacts-based standard applied by other District of Minnesota cases and requiring, instead, a "direct connection between [an individual's] Minnesota presence and their employer's statutory violation," App. 185; R, Doc. 73, at 16—a test unmoored from the text of the MHRA and inconsistent with the Minnesota legislature's directive that the Act be given the broadest possible interpretation.

The district court's job was to predict, in the absence of Minnesota Supreme Court precedent on the issue, how the high court would interpret the phrase "works in this state." *See* Part II. In making this prediction, the district court should have considered the statute's plain text, *see infra* Part II.A; its remedial purpose and application to evolving societal standards, *see infra* Part II.B; and six non-exclusive factors federal courts have examined to determine whether an individual is an employee within the meaning of the Act, *see infra* Part II.C.

The district court's conclusion that Kuklenski fell outside the MHRA's protections was error in four separate respects.

The district court first erred in departing from the plain text of the MHRA four times over. First, the legislature's use of the simple present tense "works" means only that work activity must be customary, not—as the district court held—constant or ongoing. And second, the district court ignored that an individual still "works in" Minnesota even if their physical presence in the state is temporarily interrupted. Third, the district court wrongly interpreted the word "in" to include only physical connections, not virtual or abstract ones. Fourth, and finally, nothing in the plain text of the statute supports the district court's addition of a temporal element to the definition of "employee." An individual need not be in Minnesota at the very moment they are discriminated against in order to qualify for the MHRA's protections. *See infra* Part III.A.

The district court erred a second time when it ignored the Minnesota Supreme Court's repeated exhortation that the MHRA be given a liberal construction to effectuate its remedial purpose and be interpreted in light of evolving social realities. The COVID-19 pandemic, which shut down Medtronic's Minnesota facilities in 2020 and 2021, prevented *any* employee—not just Kuklenski—from performing their daily work in the corporate office. The pandemic, and the national shift towards hybrid and remote work it engendered, are precisely the sort of changes in

employment culture that should influence judicial interpretations of the MHRA. The district court overlooked the state high court's directive and interpreted the statute not as broadly as possible, but unduly narrowly. *See infra* Part III.B.

The district court's third error was abandoning a well-established body of federal court cases using a totality-of-the-circumstances test to determine whether an individual customarily or habitually "works in" Minnesota and, thus, is an employee under the MHRA. Rather than examine the six non-exclusive factors other District of Minnesota cases have invoked to conduct this analysis, the district court deemed a Minnesota-contacts approach not "reasonable as a matter of statutory interpretation," brushing those cases aside as merely "persuasive, not binding." App. 183; R. Doc. 73, at 14. This conclusion veered sharply from other federal precedent on the issue and created an intra-district conflict likely to cause confusion in future disputes. *See infra* Part III.C.

The district court erred a fourth and final time when it disregarded the fact that Kuklenski was only unable to visit Minnesota during 2020 and 2021 because of the COVID-19 pandemic and her severe inner-ear condition. The district court wrongly applied a narrow temporal lens, focusing exclusively on a brief window within Kuklenski's 22-year career with Medtronic during which she was temporarily unable to work or visit Minnesota. The court construed key facts in favor of Medtronic—the nonmoving party. And the court ignored the Minnesota Supreme

Court's mandate that interpretations of the MHRA evolve to reflect shifting workplace realities. *See infra* Part III.D.

In light of the district court's disregard for the Minnesota Supreme Court's interpretation of the MHRA, its creation of an intra-district conflict as to the meaning of the phrase "works in this state," and the likelihood that cases involving the MHRA's coverage of remote workers will recur in federal court, this Court should certify the question of the meaning of the phrase "works in this state" to the Minnesota Supreme Court. The state high court should resolve this significant issue of first impression. *See infra* Part IV.

## ARGUMENT

The plain text of the MHRA dictates the meaning of the phrase "works in this state," particularly when interpreted liberally and pursuant to Minnesota canons of statutory construction. In light of these principles, federal courts use a totality-of-the-circumstances approach to determine whether an individual is an employee under the MHRA. *See infra* Part II. Under this approach, the district court erred in concluding that Kuklenski was not an employee, and in disregarding the fact that the COVID-19 pandemic and Kuklenski's serious medical condition were all that prevented her from being in Minnesota during 2020 and 2021. *See infra* Part III. Because the district court's order created an intra-district conflict as to this important and novel question of state law, this Court should certify to the Minnesota Supreme

Court the question of how to define the phrase "works in this state." *See infra* Part

IV.

## I. Standard of Review.

The Eighth Circuit reviews the district court's grant of summary judgment and

its interpretation of the MHRA *de novo. Riegelsberger v. Air Evac EMS, Inc.*, 970

F.3d 1061, 1064 (8th Cir. 2020).

## II. Legal Principles.

The MHRA defines "employee" as "an individual who is employed by an

employer and who resides or works in this state." Minn. Stat. § 363A.03. The MHRA

also contains a liberal-construction clause; it says that the Act "shall be construed

liberally" to achieve the MHRA's remedial designs. *Id.* § 363A.04.

Since Kuklenski does not reside in Minnesota, this case hinges on the

interpretation of the phrase "works in this state." Neither the Minnesota Supreme

Court nor the Minnesota Court of Appeals has interpreted that phrase. *See Walton v.*

*Medtronic USA, Inc.*, No. 22-cv-0050, 2022 WL 3108026, at *2 (D. Minn. Aug. 4,

2022) ("It is difficult to know what 'works in this state means. The statute itself gives

little guidance. The Court has found no state-court opinions addressing the

question."); *see also Kuklenski v. Medtronic USA, Inc.*, 635 F. Supp. 3d 726, 734–

735 (D. Minn. 2022) ("The Minnesota Supreme Court has not yet answered what it

means to 'work[ ] in this state' for purposes of the MHRA.").

With this background in mind, familiar canons of statutory interpretation, the policy underpinnings of the MHRA, and existing legal precedent guide this Court's construction of the Act.

## A. The plain text and legislative purpose of the MHRA dictate the meaning of the phrase "works in this state."

In Minnesota, the goal of statutory interpretation is "to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16. Where the legislature's intent is "clearly discernible from a statute's plain and unambiguous language," the Court simply applies the statute's plain meaning. *Hans Hagen Homes, Inc. v. City of Minnetrista*, 728 N.W.2d 536, 539 (Minn. 2007); *see also State v. Mikell*, 960 N.W.2d 230, 238 (Minn. 2021) ("When the plain language of the statute is unambiguous, we follow it."). When interpreting the plain language of a statute, courts "read words and sentences in light of their context," *Tapia v. Leslie*, 950 N.W.2d 59, 62 (Minn. 2020) (cleaned up); they "do not examine different provisions in isolation," *State v. Gaiovnik*, 794 N.W.2d 643, 647 (Minn. 2011); and they construe "words and phrases according to rules of grammar and according to their common and approved usage," Minn. Stat. § 645.08 (1) (cleaned up). "When the Legislature has not provided definitions of the relevant terms, [courts] may consider dictionary definitions to determine a word's common usage." *State v. Cummings*, 2 N.W.3d 528, 533 (Minn. 2024).

"If a statute is ambiguous, then [courts] may resort to the [additional] canons of statutory construction to determine its meaning." *500, LLC v. City of Minneapolis*, 837 N.W.2d 287, 290 (Minn. 2013). "A statute is only ambiguous when the language therein is subject to more than one reasonable interpretation." *Amaral v. St. Cloud Hosp.*, 598 N.W.2d 379, 384 (Minn. 1999). In the face of ambiguous statutory language, courts determine legislative intent by considering the statute's purpose and the reason for its enactment; the consequences of a particular interpretation; and the contemporaneous legislative history. *See* Minn. Stat. § 645.16. This Court must also "presume that the legislature intended to favor a public interest over a private interest." *Amaral*, 598 N.W.2d at 384; *see also* Minn. Stat. § 645.17(5).

## B. The legislature intended for courts to interpret the MHRA liberally and in light of evolving societal standards.

The text of the MHRA contains another important interpretive clue: it explicitly directs courts to construe its coverage broadly. The Act "shall be construed liberally for the accomplishment of the purposes thereof." Minn. Stat. § 363A.04; *see Hansen v. Robert Half Int'l, Inc.*, 813 N.W.2d 906, 916 (Minn. 2012) (cleaned up) ("Generally, statutes which are remedial in nature are entitled to a liberal construction, in favor of the remedy provided by law, or in favor of those entitled to the benefits of the statute."). The legislature's purpose in enacting the MHRA is also crystal clear: "freedom from discrimination…in employment because of race, color, creed, religion, national origin, sex, gender identity, marital status, disability, status

with regard to public assistance, sexual orientation, familial status, and age." Minn. Stat. § 363A.02.

With this liberal-construction canon in view, courts often "extend the words of a remedial statute beyond their literal import and effect in order to include cases within the same mischief, or within the reason of the statute." *Pitman Farms v. Kuehl Poultry, LLC*, 48 F.4th 866, 883 (8th Cir. 2022) (cleaned up). And in a similar vein, "[s]tatutes which are remedial in nature are entitled to a liberal construction, in favor of the remedy provided by law, or in favor of those entitled to the benefits of the statute." *Hansen*, 813 N.W.2d at 916 (cleaned up).

The Minnesota Supreme Court has repeatedly embraced broad, liberal interpretations in construing the MHRA. In *Kenneh*, 944 N.W.2d at 231, for example, the state high court recognized that "to remain useful in Minnesota," standards governing acceptable behavior in the workplace must "evolve to reflect changes in societal attitudes towards what is acceptable behavior in the workplace."

Recognizing the MHRA's remedial-purpose clause and the state high court's emphasis on liberal interpretation, Minnesota federal district courts "afford a broad construction to the term employee." *Krutchen v. Zayo Bandwidth Ne., LLC*, 591 F. Supp. 2d 1002, 1012 (D. Minn. 2008) (cleaned up); *see also Rock v. Rathsburg Assocs., Inc.*, No. 21-cv-2717, 2022 WL 4450418, at *6 (D. Minn. Sept. 23, 2022)

(noting that the term "'employee' [in the MHRA] enjoys a broad statutory definition").

### C. Federal courts determine whether an individual is an employee under the MHRA using a totality-of-the-circumstances test.

With the MHRA's plain text and its remedial purpose in mind—and absent instruction from the Minnesota Supreme Court—Minnesota federal district courts have coalesced around a contacts-based, totality-of-the circumstances test examining six non-exclusive factors to determine where someone "works in" Minnesota. The aim of the totality-of-the-circumstances text is to establish whether an individual customarily or habitually has contacts with the state of Minnesota. *See infra* Part III.A.

Under this contacts-based approach, courts examine whether: (1) the individual visited their employer's Minnesota office at least once, *see Kozloski v. Am. Tissue Servs. Found.*, No. 06-cv-295, 2007 WL 2885365, at *3 n.8 (D. Minn. Sept. 27, 2007); (2) the individual had contact with customers or employees located in Minnesota; *see Rock*, 2022 WL 4450418, at *6; (3) the individual gained commission from work in Minnesota, *see id.*; (4) the individual's supervisors or managers were located in Minnesota; *see Zarling v. Abbott Lab'ys*, No. 21-cv-23, 2021 WL 2551438, at *4 (D. Minn. June 22, 2021); (5) the individual was trained in Minnesota; *see id.*; and (6) the misconduct at issue occurred in Minnesota, *see Lapushner v. Admedus Ltd.*, No. 20-cv-572, 2020 WL 5106818, at *5 (D. Minn. Aug.

31, 2020). Individuals who satisfy these factors customarily or habitually work in Minnesota within the meaning of the MHRA.

Applying these factors and assessing the totality of the circumstances, Minnesota federal district courts have defined the term "employee" broadly and inclusively. It is "entirely reasonable," according to Minnesota federal courts, "that the Minnesota legislature intended for the MHRA to protect an individual" who resided outside of Minnesota but "physically spent time in the state, was expected to return to the state for future trainings and meetings, reported to and communicated with Minnesota supervisors, and was discriminated against in the state." *Wilson*, 2016 WL 912182, at *6. In light of the MHRA's remedial purpose and the legislature's intent to combat discrimination throughout the state of Minnesota, "to conclude otherwise would unreasonably restrict the intended reach and scope of the MHRA." *Id.* (cleaned up).

### III. The District Court Erred in Concluding That Kuklenski Was Not an Employee Under the MHRA.

The district court erred in failing to apply a Minnesota-contacts-based, totality-of-the-circumstances analysis to the question of whether Kuklenski was an employee under the MHRA. Under the proper analysis, and accounting for the factors Minnesota federal courts consider, Kuklenski "worked in" Minnesota in light of significant, regular Minnesota contacts during her remote employment with Medtronic, a Minnesota corporation; her Minnesota work training and work travel;

and disability discrimination at the hands of Medtronic that took place in Minnesota.

*See e.g., Wilson*, 2016 WL 912182, at *6; *Lapushner*, 2020 WL 5106818, at *5.

### A. The plain text of the MHRA supports a contacts-based, totality-of-the-circumstances test for determining whether an individual "works in" Minnesota.

The text of the MHRA resolves this case by offering several important clues.

*First*, the legislature's use of the simple present tense "works" shows that the work activity must simply be customary or habitual—not constant or ongoing. *Second*, the simple present "works in" falls among a wide class of descriptions that remain accurate even when the activity is interrupted temporarily. *Third*, the word "in" embraces both physical as well as virtual or abstract connections—particularly when used as a preposition for a word like "work" that doesn't demand a physical element. And *fourth*, nothing in the text of the statute suggests that there must be a temporal or physical connection between a person's work and the statutory violation.

#### (1) The simple present tense requires only customary or habitual action.

Start with the MHRA's operative verb tense. The statute applies to any person who "works in" Minnesota. "Works" is a verb expressed in the simple present tense. Simple present tense embraces two meanings. First, it "denotes acts, conditions, or states that occur in the present"—for example "the dog barks" or "the music plays." Present Tense, Chicago Manual of Style § 5.129. But the simple present tense also

embraces "a habitual action or general truth"—for example, "Steve hunts" or "Martha reads." *Id*. Simple present tense is thus "sometimes used to refer to action in the past." Present Tense, Merriam-Webster's Collegiate Dictionary.

The MHRA's simple-present-tense phrasing stands in contrast to the "present progressive" (sometimes called the "present continuous") tense. "The progressive tenses, also known as continuous tenses, show action that progresses or continues." Progressive Tenses, Chicago Manual of Style § 5.135. For example, the phrase "he is playing tennis," framed in the present progressive tense, means the person is actively and presently engaged in the act of playing tennis. This stands in contrast to the phrase "he plays tennis," which could plausibly be used (most commonly by a child or new English speaker) to express an ongoing game of tennis but much more naturally embraces the second simple-present-tense meaning: he is a tennis player who customarily or regularly plays tennis.

The legislature's choice to adopt the simple-present tense over the present-progressive tense has important consequences. The legislature could have extended the MHRA's protections only to a person who "is working" in Minnesota. That phrasing would have suggested that the work must "progress[] or continue" for the person to be protected by the law. *Id.* But the legislature instead adopted the simple present tense, which requires only "a habitual action or general truth." Present Tense,

Chicago Manual of Style § 5.129. That means a person "works in" Minnesota when she habitually or customarily does so.

Moreover, an activity described in the simple-present tense need not occur particularly frequently or last particularly long for the verb tense to apply. *See id*. Consider the phrases "Steve hunts" or "Bonnie snowboards." These assertions are grammatically accurate and appropriate even if Steve and Bonnie spend only a miniscule fraction of their time actively hunting or snowboarding. And these phrases remain grammatically accurate and apt even if Steve and Bonnie go years between hunting or snowboarding trips. *Cf. Murray v. Stuckey's, Inc.*, 50 F.3d 564, 568 (8th Cir. 1995) (executive exemption to the Fair Labor Standards Act, which requires that a person "customarily and regularly directs" the work other employees, requires "a frequency which must be greater than occasional but which, of course, may be less than constant").

These grammatical principles apply in full force here. A person "works in" Minnesota, as those words are commonly understood and used, even if that work is not particularly frequent or long-lasting.

> (2) *Temporary interruptions don't negate the simple-present tense meaning of "works".*

The legislature's choice of the simple-present tense provides a second critical clue: simple present usage remains accurate and appropriate even when the activity

is temporarily interrupted. That remains true even when the interruption lasts a long time. The simple-present tense only becomes inappropriate when there is some indication that the activity has ceased on a permanent basis. *See* Present Tense, Merriam-Webster's Collegiate Dictionary.

Take the same examples above. The phrases "Steve hunts" or "Martha reads" mean that Steve and Martha customarily or habitually engage in these activities. Now suppose Steve suffers a broken leg that takes a year to heal. Or suppose that Martha gets a concussion and is directed to refrain from reading until her condition improves. Neither of these conditions would negate the initial descriptions. To the contrary, an ordinary speaker or listener would understand that Steve still "hunts" and Martha still "reads" despite their current impairments. The simple present tense would be inaccurate only if there were some indicia that the change in circumstances changed the customary or habitual nature of the activity *permanently*.

Other familiar areas of the law illuminate these same principles. For example, diversity jurisdiction requires that the matter in controversy "is between"—present tense—"citizens of different States." 28 U.S.C. § 1332(a)(1). For purposes of establishing citizenship, a person must manifest a present "intent to make his home [in a state] indefinitely." *Eckerberg v. Inter-State Studio & Publishing Co.*, 860 F.3d 1079, 1085 (8th Cir. 2017). A person can leave his home state for long periods—for

example, by joining the military or enrolling in college—without relinquishing her present-tense state citizenship. *Id.*

These same principles govern here. Kuklenski's ability to physically travel to Minnesota was temporarily interrupted by the COVID-19 pandemic. Her ability to actively work was temporarily thwarted by her medical condition. But under normal grammatical rules, neither of these temporary conditions changed the fact that she customarily or habitually "works in" Minnesota. The district court erred when it focused exclusively on a brief interruption in Kuklenski's customary work practices and ignored her significant body of work in Minnesota prior to COVID-19 and Kuklenski's temporary illness.

### (3) The word "in" embraces both physical as well as virtual or abstract connections.

Third, the word "in" embraces both physical as well as virtual or abstract connections—particularly when used as a preposition for a word like "work" that doesn't demand a physical element.

Consider the definition of the word "in" as well as examples of its usage. "In" is "used as a function word to indicate inclusion, location, or position within limits." "In," Merriam-Webster's Collegiate Dictionary. As the district court noted, one way "in" functions as a preposition is physical: "The fish swims in the lake." "The cereal is in the pantry." It is self-evident that *some* uses of the preposition "in" refer to a

physical relationship. And an individual who conducts their work inside an office located in Minnesota certainly "works in" that state.

But the district court erred in concluding that, because "the State of Minnesota is a geographical entity with set boundaries," App. 180; R. Doc. 73, at 11 the phrase "works in this state" must have *only* a physical meaning. *See id.* ("To 'work in this state' means Kuklenski must perform duties of her job within the limits, bounds, or area of Minnesota.") (cleaned up). Turn again to the dictionary. The preposition "in" can function in all manner of abstract ways, even when the object of the preposition is a physical location. For example, a lawyer may "appear *in* the Minnesota Supreme Court" either physically, in the courthouse itself, *or* virtually, by videoconference. Indeed, whether the word "in" demands a physical connection depends largely on ordinary usage and context. An athlete who "runs in" a race in Minnesota must do so physically within the geographic boundaries of the state. But a presidential candidate "runs in" Minnesota even if he never physically enters the state. Here, both the physical and abstract definitions of "in" apply. A person "works in" Minnesota either through physical presence or through virtual employment contacts in the state.

On this point, too, other analogous areas of law illustrate these principles in action. At common law, tort law embraced the "lex loci delicti" rule—reflexively applying the law of the physical location where the tort occurred. Symeon C. Symeonides, *Choice of Law in the American Courts in 2020: Thirty-Fourth Annual*

*Survey*, 69 American Journal of Comparative Law 13 (2021). Now, virtually every state—including all states in the Eighth Circuit—apply a modern, contacts-based test. *Id.* at 18–19. Under this modern regime, a tort accrues where the parties and states have significant contacts—not necessarily in the place where the tort physically occurs. *Id.*

In this case, the district court did not justify its decision to privilege a physical definition of the word "in" over an abstract or virtual one. No justification exists. Nothing in the plain text of the MHRA requires an individual to be *physically within* the state of Minnesota, at all times, in order for that individual to qualify as an "employee" entitled to statutory protection. To the contrary, the MHRA's liberal-construction clause requires the opposite interpretive choice. Just as a lawyer may "appear in the Minnesota Supreme Court" although she is physically in Massachusetts, Kuklenski worked "in Minnesota" even when she was physically in Michigan. And just as a candidate runs for office "in Minnesota" whether or not he is inside state lines at all times, Kuklenski worked "in Minnesota" even when she was not at Medtronic's offices. The district court's crabbed reading of the phrase "works in this state" does not withstand textual scrutiny.

> *(4) The text contains no suggestion that a person must be in Minnesota at the moment their employer discriminates against them.*

And fourth, nothing in the text of the MHRA suggests that, to qualify as an employee, an individual must be physically in Minnesota at the very moment she experiences discrimination. The district court's conclusion that Kuklenski was not an employee under the MHRA "'[b]ecause she did not "work[ ] in this state' *when Medtronic allegedly discriminated against her*," App. 185; R. Doc. 73, at 16 (emphasis added) reads requirements into the statute that the legislature didn't contemplate.

Begin, once more, with the text. The MHRA's definition of "employee" contains no temporal language. "Employee" is defined as "an individual who is employed by an employer and who resides or works in this state," full stop. Minn. Stat. § 363A.03, Subd. 15. The legislature included nothing about the period of time during which an individual must be "employed by an employer" or must "work[] in this state." *Id.* The same goes for the statute's definition of unfair, discriminatory employment practices, which precludes an "employer, because of…disability…, to…discharge an employee." Minn. Stat. § 363A.08, Subd. 2(2). No references to timing—much less an alignment between an employer's discriminatory conduct and an employee's work in Minnesota—appear in the applicable portions of the MHRA. Requiring a nexus between physical presence in Minnesota and an employer's statutory violation, as the district court did, has no basis in text and thus contravenes well-established canons of Minnesota statutory interpretation, which "forbid adding

words or meaning to a statute" that the legislature did not include. *Premier Bank v. Becker Dev., LLC*, 785 N.W.2d 753, 760 (Minn. 2010).

This Court's decision in *Olson v. Push, Inc.*, 640 Fed. App'x 567 (8th Cir. 2016), is instructive. In *Olson*, the Court addressed an issue of first impression: the definition of "employer" under the Minnesota Drug and Alcohol Testing in the Workplace Act ("DATWA"), which forbids an employer from terminating an employee based on a first positive result of an employer-requested drug or alcohol test unless the employer follows certain specific steps. *Id.* at 569–70. DATWA states that an employer is a "person or entity located or doing business in [Minnesota]." *Id.* at 569. Push conceded that it did business in Minnesota but argued that it was nevertheless not an employer because its Minnesota business was not related to "the employment for which it conducted drug testing." *Id.* (cleaned up).

This Court rejected Push's argument and held that "DATWA contains no language limiting its application only to drug testing of those employees whose employment is directly related to an employer's Minnesota business activities." *Id.* at 569–70. Rather, this Court "decline[d] to read into DATWA's statutory definition of 'employer' a requirement that there be a nexus between the drug testing and 'relevant business,'" concluding that "the legislature drafted DATWA broadly to encompass all employers that…conduct business in Minnesota" in light of its "remedial…nature." *Id.* at 570.

41

*Olson*'s logic applies squarely here. Had the legislature intended to require that an employee be physically present in the state of Minnesota at the very instant she suffered discrimination in order to qualify for the MHRA's protections, it surely would have said so. But it did not say that. Indeed, the legislature said nothing at all about a connection between physical presence in Minnesota (to the extent any at all is required by the statute's text) and the timing of an employer's unlawful conduct. The district court was not entitled to substitute its opinion for the legislature's. Where "the statute speaks plainly, [courts] will not supply that which the legislature purposefully omits or inadvertently overlooks." *Green Giant Co. v. Comm. of Revenue*, 534 N.W.2d 710, 712 (Minn. 1995).

The district court's injection of a temporal nexus requirement into the MHRA was error in yet another respect. "When relying on the plain statutory text, [Minnesota courts] read words and phrases to avoid absurd results and unjust consequences." *KSTP-TV v. Ramsey Cnty.*, 806 N.W.2d 785, 788 (Minn. 2011); *see also* Minn. Stat. § 645.17(1) (courts may presume that "the legislature does not intend a result that is absurd, impossible of execution, or unreasonable"). But the district court's conclusion, writ large, would yield just such dire results. Imagine an employee who resides in Minnesota and works virtually all of the time at her employer's Minnesota offices. Now imagine that employee travels to a conference in Iowa for two days. During the conference, the employer calls his employee on the

phone and makes sex-based discriminatory remarks that run afoul of the MHRA. Are courts to disregard that employee's legitimate claims simply because she happened to be outside state lines when her employer chose to violate the law? The district court would apparently say yes. That conclusion is untenable and unfair.

The "unjust" policy ramifications of the district court's interpretation don't end there. While the district court claimed that an individual need not "be physically in Minnesota when the adverse action occurs," App. 185; R. Doc. 73, at 16, that is precisely the import of its analysis and conclusion: "What matters," the court wrote, "is where [Kuklenski] worked in 2021, when Medtronic allegedly violated the MHRA." *Id.* A temporal nexus requirement under the MHRA would threaten pattern-or-practice and hostile-work-environment employment claims, both of which accrue over time not in a single moment. *See, e.g.*, *Miller v. Grand Holdings, Inc.*, No. 04-cv-2688, 2005 WL 1745639, at *5 (D. Minn. Jul. 26, 2005) (noting that hostile work environment claims are "an unlawful employment practice" that "manifests itself over time"). Under the district court's interpretation, courts could consider only those improper comments or behaviors that occurred while an individual was physically within Minnesota, a hair-splitting exercise sure to narrow the statute's intended broad reach. Any employment rights related to time away from the workplace—ranging from parental and pregnancy leave to the state-law Family and Medical Leave Act to disability accommodations—would similarly be at risk

for employees who live outside of Minnesota. The district court's reading of the MHRA risks giving employers *carte blanche* to discriminate so long as they do during a time period when the employee in question is out of the office and outside the state.

## B. A contacts-based approach fulfills the MHRA's remedial purpose.

Although the text of the statute is clear, a contacts-based approach to determining employment status also aligns with the purpose of the MHRA. *See* Minn. Stat. § 645.16 (legislative purpose canon).

First, a totality-of-the-circumstances, contacts-based approach best fulfills the legislature's goal of stamping out discrimination in Minnesota. Here, the legislature wanted "freedom from discrimination…in employment because of…disability." Minn. Stat. § 363A.02. A contacts-based approach accords with that legislative purpose, prohibiting discrimination with significant contacts to Minnesota—and therefore significant implications for state public policy.

Second, a contact-based approach best aligns with the Minnesota Supreme Court's exhortation that employment Standards must "evolve to reflect changes…in the workplace." *Kenneh*, 944 N.W.2d at 231. The pandemic, and the national shift towards hybrid and remote work that followed, are precisely the sort of shifts in employment culture that should influence judicial interpretations of the MHRA.

Just as the law of personal jurisdiction has evolved from looking at physical presence to analyzing the totality of a party's contacts, *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), so too here the concept of "work" must be interpreted in light of evolving concepts of remote work.

The Minnesota Supreme Court has taken precisely this tack in similar cases. In *Kenneh*, 944 N.W.2d 231, for example, the court invoked "changes in societal attitudes towards" to conclude that various sexually suggestive comments could amount to sex-based discrimination. Likewise in *Frieler*, 751 N.W.2d at 573, the court adopted the broader proposed definition of "supervisor" for sexual harassment claims under the MHRA. The court explained that it had "consistently held that the remedial nature of the Minnesota Human Rights Act requires liberal construction of its terms." *Id.* The court also adopted the interpretation it did because narrower proposed definition "ignore[d] the reality of the modern-day workplace," where "where individuals are often given significant power over other employees, even if another employee has 'final' decision-making authority when it comes to issues like hiring, firing, and setting wages." *Id.*

In short, a contacts-based, totality-of-the-circumstances interpretation of the phrase "works in" best accords with the MHRA's goal of stamping out unlawful discrimination in Minnesota and interpreting the statute to capture shifting workplace conduct and the "realit[ies] of the modern-day workplace." *Id.*

### C. Kuklenski "worked in" Minnesota in light of her significant, regular Minnesota contacts and travel to Minnesota for work.

On the facts of this case, Kuklenski worked in Minnesota. The district court erred in concluding otherwise.

Kuklenski visited her employer's Minnesota office at least once. App. 168; R. Doc. 69, at 1; App. 219; R. Doc. 45-1, at 13. App. 219; R. Doc. 45-1, at 13. *See Kozloski*, 2007 WL 2885365, at *3. Indeed, she did so frequently before the pandemic and would have visited frequently again but for her unlawful termination. App. 219; R. Doc. 45-1, at 13.

Kuklenski had contact with customers or employees located in Minnesota. *See Rock*, 2022 WL 4450418, at *6. She regularly attended work related conferences and went to meetings with Medtronic's employees and customers within the state. App. 168; R. Doc. 69, at 1.

Kuklenski's supervisors or managers were located in Minnesota. App. 169; R. Doc. 69, at 2. *See Zarling*, 2021 WL 2551438, at *4.

Kuklenski likewise received training in Minnesota on a regular basis—both virtually and in-person. *See id.* Kuklenski's work performed within Minnesota during her term of employment with Medtronic included completing work-related training. App. 168; R. Doc. 69, at 1; App. 219; R. Doc. 45-1, at 13.

And the misconduct at issue occurred in Minnesota. *See Lapushner*, 2020 WL 5106818, at *5. The decision to rebuff Kuklenski's request for a reasonable accommodation and terminate Kuklenski was made in Minnesota.

These evidentiary factors collectively show that Kuklenski customarily worked in Minnesota.

That result follows from district court cases that examined similar fact patterns. In *Wilson*, the court held that an individual who resided in Kentucky was a Minnesota employee, in part because he communicated with Minnesota employees by phone and email and all his supervisors were located in Minnesota. 2016 WL 912182, at *6. The plaintiff in that case, a Kentucky resident, was an employee of a Minnesota-based manufacturing company. The plaintiff was a regional sales employee whose region did not extend to Minnesota. Wilson traveled twice to Minnesota for training at the defendant's headquarters. *Id.* at *1. In addition, Wilson communicated with Minnesota-based supervisors and employees "almost daily by phone or email." *Id.*

On these facts, along with the facts that (a) Wilson would have returned to Minnesota for additional training and meetings had he not been fired, (b) his supervisors were located in Minnesota, and (c) "the discriminatory acts and statements occurred in Minnesota," the court ruled that Wilson met his pleading standard sufficient to establish the the MHRA applied. *Id.* at *6. In reaching this

conclusion, the court emphasized the Minnesota legislature's directive that the MHRA be liberally construed, finding it "entirely reasonable that the Minnesota legislature intended for the MHRA to protect an individual like Wilson." *Id*.

In *Lapushner*, a non-Minnesota resident sales employee with a non-Minnesota sales territory sued a Minnesota employer under the MHRA. The court denied the motion to dismiss based on contacts that included "travel reimbursement decisions, e-mails, and the decision to terminate her—originated or were made in the District of Minnesota." 2020 WL 5106818, at *2.

More recently, in *Hull v. ConvergeOne, Inc*., 570 F. Supp. 3d 681 (D. Minn. 2021), the court visited the issue of non-resident employee protection of the Minnesota Payment of Wages Act, Minn. Stat. § 181.145, subd. 2, which, similar to the MHRA, applies to a business "employing a commission salesperson in this state." The statute protected the plaintiff in *Hull* in light of her (1) three-day training session in Minnesota, (2) daily WebEx and Zoom calls with Minnesota personnel, (3) quarterly conference calls, (4) virtual training events, many hosted in Minnesota, (5) pay received from Minnesota and corporate and (6) corporate announcements from Minnesota. 570 F. Supp. 3d at 5–6.

Under the facts present here, Kuklenski worked in Minnesota.

### D. Kuklenski's Absence from Minnesota Due to Medical Leave and the COVID-19 Pandemic Does Not Alter This Analysis

All the foregoing principles coalesce to reveal the district court's final error: its conclusion that Kuklenski did not "work in Minnesota in late 2020 or 2021" because she did not have "any physical presence in Minnesota" during that time period. App. 182; R. Doc. 73, at 13. Kuklenski was physically absent from Minnesota that year only because of (1) the COVID-19 pandemic and (2) her serious medical condition. The district court's exclusive focus on Kuklenski's temporary absence from Minnesota ignores the broad temporal lens federal courts have used to interpret the phrase "works in Minnesota"; it construes facts in favor of the non-moving party—Medtronic—rather than Kuklenski; and it disregards the Minnesota Supreme Court's declaration that the MHRA's construction must account for changing social mores and employment dynamics.

*(1) The district court wrongly applied a narrow temporal lens.*

The district court erred in looking solely at the moment Medtronic terminated Kuklenski to assess whether she was an employee under the MHRA. Based on this narrow focus, the district court excluded Kuklenski from MHRA coverage because of two events outside her control: the onset of the COVID-19 pandemic, which upended in-person work expectations across the country, and Kuklenski's surgery

to correct an inner-ear condition, which precipitated an unexpectedly long period of recovery and limited her ability to work at all.

Federal courts construing the MHRA have taken precisely the opposite temporal approach when examining the totality of the circumstances. In *Wilson*, for instance, the court focused on the entire period of the plaintiff's tenure with his employer to determine whether he was an employee, including expectations for the *future* based on his customary and habitual practices in the past. *Wilson*, 2016 WL 912182, at *6 (construing the MHRA "liberally" and emphasizing that Wilson, "despite not working in Minnesota full-time…was expected to return to the state for *future* trainings and meetings" in addition to time he had already spent in Minnesota). The fact that the plaintiff "*would have* returned to the state" for work influenced the court's analysis, even though the employer terminated him before those visits could occur. *See id.*

*Walton* is similar. The court denied Medtronic's motion to dismiss Walton's MHRA claim, rejecting Medtronic's argument—the same one it made below in this case—that Walton, who lived outside Minnesota, did not qualify as an employee because he did not "work in Minnesota." 2022 WL 3108026, at *2. In addition to Walton's quarterly visits to Minnesota over the course of his 25-year career with Medtronic, the court found, "there was an *ongoing expectation* that he would travel to Minnesota every quarter or so to work on behalf of Medtronic." *Id.* As in *Wilson*,

the court in *Walton* focused on the entire time period of Walton's employment, including the likelihood of future visits to Minnesota that hadn't yet occurred when Medtronic terminated Walton.

The upshot of this approach—in keeping with the requisite liberal construction of the MHRA—is a broad, holistic view of the relevant time period for assessing whether an individual "works in" Minnesota. The full picture of an individual's employment tenure is what matters, not temporary changes in that individual's location or work practices. Any other approach would condition an individual's MHRA coverage on incidental or transient dynamics of their Minnesota employment contacts, granting statutory protections on one day but denying them the next. That kind of flip-flopping would contravene the legislature's protective vision for the MHRA, depriving employees of coverage based on happenstance.

In view of this established federal precedent, the district court erred in taking the narrowest possible view of Kuklenski's presence in Minnesota for her work with Medtronic. Unlike *Wilson*, which relied on planned future visits to Minnesota, and *Walton*, which focused on Medtronic's expectation that Walton would regularly return to the state, the district court here focused on the "year before any alleged discrimination occurred"—the very year that COVID-19 upended in-person work practices in Minnesota and across the country, and the very year Kuklenski was sidelined from any work at all due to a severe medical condition.

Kuklenski worked for Medtronic—and maintained customary, regular contacts with Minnesota—for 22 years. The district court denied her statutory protection because of a temporary interruption in her Minnesota work practices. That blinkered vision of the phrase "works in this state" violates the MHRA's text and remedial purpose and abandons well-reasoned precedent.

### (2) The district court wrongly construed facts in the light most favorable to Medtronic.

The district court also construed key facts against Kuklenski, in contravention of the summary-judgment standard, when it concluded that "Kuklenski stopped performing services in Minnesota in February 2020" for purposes of MHRA analysis. App. 186; R. Doc. 73, at 17. This finding stemmed from the district court's inferences in favor of Medtronic, not Kuklenski, and its consideration of Kuklenski's lengthy employment with Medtronic in the light most favorable to the defendant, not the moving party. The factual record, properly viewed in Kuklenski's favor, is clear that she continued to "work in" Minnesota notwithstanding her temporary COVID-19 and illness-induced absence. Contrary to the district court's conclusion, it makes *all* the difference that "Kuklenski might have been in Minnesota but for the COVID-19 pandemic" and her surgery.

A reasonable juror could easily conclude that, based on Kuklenski's continuous, regular contacts with Minnesota for the prior two decades, she still "worked in" Minnesota for purposes of the MHRA notwithstanding the pandemic

and her inner ear surgery. At trial, the jury would about Kuklenski's customary and habitual work practices, not whether she was in Minnesota for any particular period of time. So instructed, a jury could reach precisely the opposite conclusion about Kuklenski's work in Minnesota than the district court.

### (3) The district court failed to account for the reality of remote work during the COVID-19 pandemic.

The district court's refusal to acknowledge the realities of in-person work during the COVID-19 pandemic flies in the face of precedent from the Minnesota Supreme Court interpreting the MHRA.

In *Kenneh*, the state high court reiterated that "the essence of the Human Rights Act is societal change." 944 N.W.2d at 231 (cleaned up). To facilitate this legislative aim, legal standards—including interpretations of the MHRA—"must evolve to reflect changes in societal attitudes towards what is acceptable behavior in the workplace." *Id* "Today," the Minnesota Supreme Court explained, "reasonable people would likely not tolerate the type of workplace behavior that courts previously brushed aside." *Id* The state high court again emphasized the importance of construing the MHRA in light of shifting employment dynamics in *Frieler*, which adopted a broad definition of the term "supervisor" for purposes of sexual harassment claims under the MHRA. 751 N.W.2d at 573. The court explained that a "narrower definition of supervisor is a simplistic taxonomy that ignores the reality of the modern-day workplace." *Id* (cleaned up).

The implications of *Kenneh* and *Frieler* for employment practices during the COVID-19 pandemic are clear. If confronted with the issue, the Minnesota Supreme Court would interpret the phrase "works in this state" in light of the proliferation of remote work since the COVID-19 pandemic—in keeping with the contacts-based, totality-of-the-circumstances test set forth *supra* at Part II.C. In contrast, construing the MHRA blind to the "reality of the modern-day workplace," *Frieler*, 751 N.W.2d at 573, would deprive numerous employees who work on a hybrid or fully remote basis of the MHRA's protections. But that's just what the district court did when it brushed aside the significance of the pandemic to its determination of whether Kuklenski was an employee.

There is no dispute that throughout 2021, Medtronic's entire U.S. workforce—including all its Minnesota employees—worked remotely because of the pandemic. Medtronic did not plan to bring any employees back to the office until the fall of 2021. Employees had no choice: they could not work in Medtronic's Minnesota offices even if they wanted to. The district court's order did not confront these inescapable realities. Instead, it penalized Kuklenski for circumstances outside her control, using a national crisis to justify denying her statutory coverage she earned based on two decades of frequent Minnesota contacts. The rationale underlying the district court's conclusion is that Kuklenski, who was prohibited from entering the Minnesota offices because of the pandemic and physically incapable of

working due to her medical condition in any event, should be treated identically to an employee whose shifting work responsibilities diminished or cut off their previously customary Minnesota contacts. That assumption can't be squared with *Kenneh* and *Frieler*.

The district court should have construed the MHRA *in light of* the pandemic, not as if it didn't exist. Its disregard for the significance of the pandemic was error.

IV. **This Court Should Certify the Question of the Definition of "Works in This State" Under the MHRA to the Minnesota Supreme Court.**

The district court's decision created an intra-district conflict about the meaning of the phrase "works in this state." In light of that conflict, and because this significant state-law question of first impression will likely recur in federal courts, this Court should certify to the Minnesota Supreme Court the question of the definition of "employee" under the MHRA.

A. **Legal principles.**

The Minnesota Supreme Court "may answer a question of law certified to it by a court of the United States…if the answer may be determinative of an issue in pending litigation in the certifying court and there is no controlling appellate decision, constitutional provision, or statute of this state." Minn. Stat. § 480.065, Subd. 3 (2012). This Court's "most important" consideration in deciding whether to certify a question to a state court is whether the Court "finds itself genuinely uncertain about a question of state law." *Johnson v. John Deere Co.*, 935 F.2d 151,

153 (8th Cir.1991) (cleaned up).

Certification is particularly appropriate when, as here, a federal court confronts "novel issues of state law peculiarly calling for the exercise of judgment by the state courts." *McKesson v. Doe*, 592 U.S. 1, 5 (2020). In such contexts, "speculation by a federal court about how a state court would rule…is particularly gratuitous when the state courts stand willing to address questions of state law on certification." *Id.* at 5–6 (cleaned up); *see Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 77 (1997) (cleaned up) ("Through certification of novel or unsettled questions of state law for authoritative answers by a State's highest court, a federal court may save time, energy, and resources and help build a cooperative judicial federalism.").

The Eighth Circuit has "an independent discretion of its own to decide whether certification is appropriate." *Godfrey v. State Farm Fire & Cas. Co.*, 11 F.4th 601 (8th Cir. 2021) (cleaned up). This discretion includes certification "in limited circumstances" even "after a case has been decided." *Perkins v. Clark Equip. Co.*, 823 F.2d 207, 208 (8th Cir. 1987).

### B. This Court should exercise its discretion to certify the question of "works in this state" to the Minnesota Supreme Court.

Certification is the best course here for three reasons: no Minnesota state courts have interpreted the phrase "works in this state"; the district court's decision created an intra-district conflict on that question; and this significant issue of first

impression is likely to recur in the federal courts.

*(1) State courts have not interpreted the phrase "works in this state."*

Federal courts have repeatedly acknowledged the absence of state law authority as to the meaning of the phrase "works in this state." In *Walton*, the court wrote that "[it] is difficult to know what 'works in this state' means. The statute itself gives little guidance. The Court has found no state-court opinions addressing the question." 2022 WL 3108026, at *2. And the district court in this case recognized that the "Minnesota Supreme Court has not answered what it means to 'work[] in this state' for purposes of the MHRA," noting that "[e]xtensive independent research hasn't yielded a clear answer to the statutory interpretation question." App. 24, 26; R. Doc. 17, at 8, 10. Absent certification, this Court, too, will be forced to interpret "the meaning of a state statute in the absence of prior state court adjudication." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 510 (1985) (O'Connor, J., concurring).

*(2) The district court's decision created an intra-district conflict on a significant question of state law.*

The district court's interpretation of the phrase "works in this state" to require "a direct connection between [an individual's] Minnesota presence and their employer's statutory violation," App. 185; R. Doc. 74, at 16, radically departs from other federal precedent on the question. The district court acknowledged as much, noting in its motion-to-dismiss order that "[s]everal cases from this District" have

interpreted this phrase "by analyzing whether the nature and quantity of a plaintiff's work-related Minnesota contacts are sufficiently substantial to warrant concluding that the plaintiff works in Minnesota." App. 24; R. Doc. 17, at 8. In its summary-judgment order, however, the district court dismissed as "persuasive, not binding," any case that "seem[ed] to rely on a Minnesota-contacts-based approach to the MHRA definition of employee." App. 183; R. Doc. 73, at 14. The court offered no explanation for this abrupt departure other than to say "Kuklenski fails to explain why such an approach is reasonable as a matter of statutory interpretation." *Id.*

This situation cries out for certification. In light of the "lack of state sources enabling a nonconjectural determination" of what the phrase "works in this state" means, *Smith v. SEECO, Inc*., 922 F.3d 406, 412 (8th Cir. 2019), this Court should end the cycle of federal speculation about how the state high court would rule and the Minnesota Supreme Court to address the question.

Other circuits routinely certify similar questions. The Second Circuit recently certified a similar question under the New York State and City human rights laws to the Court of Appeals of New York. *See Syeed v. Bloomberg L.P.*, 58 F.4th 64 (2d Cir. 2023). The question related to a plaintiff's "physical location at the time of the alleged discriminatory acts." *Id.* Having accepted the certified question, the Court of Appeals held that a nonresident applying for a position or promotion in New York State or City is protected by the human rights laws if she pleads, and later proves,

that an employer deprived her of a City- or State-based job opportunity on discriminatory grounds. *Syeed v. Bloomberg L.P.*, No. 20, --- N.E.3d ----, 2024 WL 1097279, at \*4 (N.Y. Mar. 14, 2024).

The Second Circuit certified this question to the Court of Appeals for three reasons: first, "the absence of *any* state-court decisions directly on point, as well as the absence of clear guidance from any state-court decisions from which [the Circuit] can predict how the New York Court of Appeals would answer [the] question," plus conflicting federal court decisions; second, the "competing state interests" and "value judgments" at play; and third, the outcome-determinative nature of the question to be certified. *Syeed*, 58 F.4th at 70–71.

And the Ninth Circuit, in *Sullivan v. Oracle Corp.*, 557 F.3d 979, 983 (9th Cir. 2009), certified questions to the California Supreme Court addressing the application of California overtime law to employees who reside outside the state. The *Sullivan* court recognized that the "answer to the [certified] questions will have considerable practical importance" given the "number of California-based employers employ out-of-state residents." *Id.* The Ninth Circuit also noted that "there is no directly controlling [state-court] precedent on the question." *Id.*

The factors supporting certification in *Syeed* and *Sullivan* are present here, too. No state court decisions have interpreted the MHRA's definition of "employee" or the meaning of the phrase "works in this state," and the district court's order

created an intra-district conflict. The question of who should qualify as an "employee" under Minnesota's human rights law epitomizes policy questions of great importance to the state. And the definition of "employee" controls the resolution of this appeal. This Court should follow the path the Second Circuit took in *Syeed* and the Ninth Circuit took in *Sullivan* and certify the core question in this case to the Minnesota Supreme Court.

### (3) The question of how to interpret the phrase "works in this state" will likely recur before the federal courts.

Certification is particularly warranted given the near inevitability that this very question will reoccur, time and again, before federal courts in Minnesota. In the wake of the COVID-19 pandemic, hybrid- and remote-work practices are here to stay. Individuals who live outside the state but work for Minnesota companies will continue to seek protection from discrimination under the MHRA. And the district court's departure from a Minnesota-contacts-based approach to the definition of "employee" reveals that federal courts will continue to disagree how best to interpret the statute, leaving the answer to this significant and timely question up in the air.

This is especially so because employment cases filed by nonresident plaintiffs against Minnesota entities are almost certain to be litigated in federal court. The near-automatic presence of diversity jurisdiction—plus the likelihood that plaintiffs will plead federal claims as well as state ones—means that Minnesota state courts may rarely, if ever, confront the MHRA's definition of "employee," while federal courts

will face it frequently.

In such a unique circumstance, this Court should err on the side of certification. Otherwise, federal courts will continue to confront a question that is significant, timely, unresolved by the ultimate decision-maker, and certain to recur.

**CONCLUSION**

For the foregoing reasons, this Court should certify to the Minnesota Supreme Court the question of whether Kuklenski "works in" Minnesota. Alternatively, this Court should reverse the district court's Order granting Medtronic's motion for summary judgment and remand for trial on Count III of Kuklenski's Complaint.

Dated: April 8, 2024

**HALUNEN LAW**

*/s/ Pamela A. Johnson*
Pamela A. Johnson # 0269667
Pamela M. Spera #263667
1650 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
Telephone: (612) 605-4098
Facsimile: (612) 605-4099
p.johnson@halunenlaw.com
*spera@halunenlaw.com*

**ATTORNEYS FOR APPELLANT**

**CERTIFICATE OF COMPLIANCE**

I certify that the attached APPELLANT'S OPENING BRIEF ON APPEAL:
(1) complies with the type-volume limitation of Federal Rules of Appellate
Procedure 29(a)(5) and 32(a)(7)(B) because it contains 11,848 words, excluding the
parts of the brief exempted by Federal Rule of Appellate Procedure 32(f); (2)
complies with the typeface requirements of Federal Rule of Appellate Procedure
32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure
32(a)(6) because it has been prepared in a proportionally spaced typeface using
Microsoft® Word for Microsoft 365 MSO (Version 2402 Build 16.0.17328.20124)
32-bit, in 14-point Times New Roman font.

*/s/Pamela A. Johnson*
Pamela A. Johnson
Attorney

## VIRUS CHECK CERTIFICATION

I certify that the attached APPELLANT'S OPENING BRIEF ON APPEAL complies with Local Rule 28A(h)(2) because the ECF submission has been scanned for viruses with the most recent version of Bitdefender (27.0. 30.140) and is virus-free according to that program.

/s/Pamela A. Johnson
Pamela A. Johnson
Attorney

# CERTIFICATE OF SERVICE

I certify that on April 8, 2024. I electronically filed the foregoing APPELLANT'S OPENING BRIEF ON APPEAL with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the appellate CM/ECF system. I certify that all participants in this case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system. I further certify that, within five days of receipt of the notice by this court that the brief has been filed, the foregoing brief will be sent by Federal Express, next-day mail, to the Clerk of the Court (ten copies) and to the following counsel of record (one copy each) pursuant to Local Rule 28A(d):


Avery Bennett
LITTLER & MENDELSON
1300 IDS Center
80 S. Eighth Street
Minneapolis, MN 55402-2136
Email: abbennett@littler.com

Daniel Bihrle
LITTLER & MENDELSON
1300 IDS Center
80 S. Eighth Street
Minneapolis, MN 55402-2136
Email: dbihrle@littler.com

Claire B. Deason
LITTLER & MENDELSON
1300 IDS Center

80 S. Eighth Street
Minneapolis, MN 55402-2136
Email: cdeason@littler.com

Jenny Gassman-Pines
GREENE & ESPEL
Suite 2200
222 S. Ninth Street
Minneapolis, MN 55402-0000
Email: jgassman-pines@greeneespel.com


Marko Joseph Mrkonich
LITTLER & MENDELSON
1300 IDS Center
80 S. Eighth Street
Minneapolis, MN 55402-2136
Email: mmrkonich@littler.com

Katherine M. Swenson
GREENE & ESPEL
Suite 2200
222 S. Ninth Street
Minneapolis, MN 55402-0000
Email: kswenson@greeneespel.com

*/s/Pamela A. Johnson*
Pamela A. Johnson
Attorney